U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2013 MAR 26 PM 2: 26

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:11-cr-94
)
MICHAEL NORRIE )

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS
(Doc. 28)

This matter came before the court on November 7 & 28, 2012 and December 13, 2012 for an evidentiary hearing on Defendant Michael Norrie's motion to suppress statements. (Doc. 28.) The court heard testimony from Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") Special Agent David Campbell; Vermont State Police Detective Jason Letourneau; Vermont State Police Trooper Matthew Nally; ATF Special Agent James Mostyn; and Mary Willmuth, Ph.D. The court also reviewed an audio recording of Defendant's interview with Agent Mostyn on October 8, 2010; an audio recording of the conversation between Agent Mostyn, Agent Campbell, and Defendant during a transport of Defendant to an ATF office on October 10, 2011; and a video recording of Defendant at an ATF office on October 10, 2011, as well as transcripts of those recordings and a transcript of a portion of a grand jury proceeding on January 20, 2011. The parties completed post-hearing briefing on February 5, 2013.

Defendant is charged with one count of possession of a firearm by an illegal user of a controlled substance in violation of 18 U.S.C. § 922(g)(3) and one count of possession of a stolen firearm in violation of 18 U.S.C. § 922(j). He seeks suppression of certain statements that he made to law enforcement officers, arguing that he was subject to custodial interrogation without knowingly, intelligently, and voluntarily waiving his *Miranda* rights; that his statements were not voluntary; and that he lacked the volitional capacity to refuse to answer questions. The Government opposes the motion.

The Government is represented by Assistant U.S. Attorney Joseph R. Perella. Defendant is represented by David V. Kirby, Esq.

## I.    Findings of Fact.

Defendant moves to suppress statements made on three different occasions: (1) his interview on October 8, 2010 with Agent Mostyn; (2) his grand jury testimony on January 20, 2011; and (3) his post-arrest statements made to Agent Campbell and Agent Mostyn on October 10, 2011.

### A.  Defendant's Personal Characteristics and Criminal History.

Defendant is a twenty-two year old male, born and raised in St. Johnsbury, Vermont. Defendant had a difficult childhood which included abuse. He has been diagnosed as mildly mentally retarded with a history of head trauma and learning disabilities. He has a history of substance abuse, including the use of inhalants.

Defendant has four prior criminal convictions; two misdemeanors in 2008 and a felony in 2009 and in 2010. There is no evidence that Defendant has previously been found incompetent to stand trial or that his competency has previously been raised as an issue in any criminal or civil proceeding.

The court has previously examined the nature and extent of Defendant's intellectual deficits and other characteristics in the context of a competency evaluation and has found Defendant competent to stand trial with certain trial accommodations. *See United States v. Norrie*, 2012 WL 4955211, at *9 (D. Vt. Oct. 17, 2012). The court incorporates its factual findings regarding competency herein by reference. However, in doing so, the court notes that, at the time of the competency hearing, the court had not reviewed the evidence at issue in the motion to suppress. Upon review of this evidence, the court finds that Defendant has a significantly greater ability to follow trial proceedings and to assist in his defense than the court previously found in concluding that Defendant is competent to stand trial.

In addition to the *Miranda* warnings at issue in this case, Defendant received *Miranda* warnings and signed *Miranda* waivers twice on October 15, 2010, once on October 18, 2010, and twice on January 22, 2011. During the October 15, 2010

2

interview, Defendant asked who *Miranda* was. Law enforcement responded that they were referring to his rights. Defendant inquired why he needed to be read his rights and if this meant he was in trouble. He also told law enforcement that they did not need to read him his rights because he already knew them. During the January 22, 2011 interview, at one point, Defendant invoked his right to counsel and advised law enforcement that he did not want to speak to them without a lawyer.[1]

### B.    October 8, 2010 Interview.

On October 8, 2010, Agent Mostyn and Trooper Nally drove to the home of Defendant's father in St. Johnsbury, for a scheduled meeting with Defendant. After Defendant failed to appear, Defendant's father told Agent Mostyn and Trooper Nally that Defendant was living at a trailer park. Agent Mostyn and Trooper Nally then proceeded to the trailer park and spoke with Defendant's girlfriend. Defendant's girlfriend contacted Defendant, and shortly thereafter, at approximately 8:30 p.m., Defendant walked up to the trailer with three other people.

Agent Mostyn introduced himself to Defendant in the driveway as a law enforcement officer and invited Defendant to sit with him in Trooper Nally's truck so that he could ask Defendant questions. Defendant agreed to do so without hesitation. Defendant was not handcuffed or otherwise restrained. The dome light of the truck was not on, but the dashboard lights and outside lighting provided illumination. The doors to the truck were not locked. Trooper Nally remained outside the truck, but in close proximity to it.

At the commencement of the interview, Defendant asked to smoke and stated, "You guys are here to arrest me, right?" to which Agent Mostyn responded, "Dude, . . . do we look like we can even arrest you?" Defendant then again asked if he could smoke in the truck, and Trooper Nally granted him permission with Defendant replying: "Can I

---

[1] During the interview on January 22, 2011, Defendant stated: "Okay, whatever. Let's go. Bring me back to jail. I don't got nothing else to tell you till I get a lawyer." (Doc. 58-1.) Upon Defendant's reference to a lawyer, law enforcement ceased questioning. The questioning later resumed, at Defendant's request, and after Defendant was again advised of and signed a written waiver of his *Miranda* rights.

roll the window down, buddy. So where are you guys from?" Agent Mostyn told

Defendant he was from ATF and Defendant replied, "I believe you, dude." Agent

Mostyn informed Defendant that he was not there to discuss the matter which Defendant

had previously spoken about to Agent Campbell on May 20, 2010.[2] Agent Mostyn

informed Defendant that he was not under arrest and had no obligation to speak with him.

Defendant responded in the affirmative to these statements. Agent Mostyn told

Defendant that "your name came up in my investigation." He then asked Defendant

about a .357 caliber handgun "from approximately a year and a half ago." Defendant

volunteered a name of an individual and when Agent Mostyn asked who that was,

Defendant responded: "Oh, f*ck, man. My old lady's best friend's boyfriend actually.

He's the one who owns it." Defendant then provided two other names, stating "That's

the only one I know of, buddy." When Agent Mostyn asked about someone named

"Jamie," Defendant identified two individuals he knew with that first name.

Agent Mostyn asked Defendant to tell him about the gun, and Defendant

responded, "Oh, nothing, I really don't know anything about it." Agent Mostyn

cautioned Defendant that lying to a federal agent was a felony. Defendant responded that

he was not lying and that he would tell Agent Mostyn what he knew. Defendant stated

that a friend of his had the gun and that this friend falsely stated that he had bought it

from Defendant in retaliation for Defendant's "hitting on" the friend's girlfriend at a

party. Defendant assured Agent Mostyn that Jamie would confirm this. Defendant

---

[2] Defendant has withdrawn his motion to suppress the statements he made to Agent Campbell on
May 20, 2010. (Doc. 64 at 4.) The Government has nonetheless introduced into evidence, as
Government's Exhibit A, a Report of Investigation regarding that interview and Defendant's
signed written statement summarizing the interview. These documents reveal that Defendant
initially denied any knowledge of an individual referred to herein as "G.G." and a stolen gun.
When Agent Campbell confronted Defendant with statements made by G.G., Defendant
"relented and said [G.G.] may have stolen the firearm from his (Norrie's) home." Defendant
thereafter provided a relatively detailed statement regarding his knowledge of the crime, altering
his statement when confronted with inconsistencies. He maintained that he had no involvement
in G.G.'s alleged theft of the firearm from Defendant's father's gun cabinet. At the conclusion
of the May 20, 2010 interview, Agent Campbell summarized the interview in a written statement
which he read to Defendant and permitted Defendant to read. Defendant initialed his corrections
to it, and signed it subject to the penalty of perjury.

concluded, "But besides that, that's it." Agent Mostyn again cautioned Defendant, telling him that: "If you're going to lie to me, then you might as well just leave because I'm not going to deal with you if you lie to me." Defendant assured Agent Mostyn that he was not going to lie and told Agent Mostyn that he was a "good guy" but that "all you guys put a lot of stress on my girlfriend." Agent Mostyn pointed out that Defendant could have avoided that stress if he had showed up for their interview at his father's house where they had waited for an hour. Defendant stated he had called his father who told him that the law enforcement officers had not shown up.

When Agent Mostyn informed Defendant that his story regarding the gun was different from the one Agent Mostyn had obtained from interviews with other people, Defendant stated that he was aware that everyone was claiming he stole the gun, but he in fact did not. Defendant further stated, "I swear on my life, I swear on my kid's life. I didn't take the gun, but everybody says I did." Agent Mostyn then asked about "Jamie" and Defendant responded that Jamie had come to his house threatening him. He explained the reason for Jamie's belief that Defendant had taken the gun and said he would not have taken it from Jamie, because he was afraid of him. He corrected a statement Agent Mostyn made about Jamie's car. Defendant reiterated that he neither took the gun, nor tried to get it back.

At one point in the interview, Agent Mostyn assured Defendant he was "not the target of this investigation" and that if he broke into a car and stole the gun, he was not going to get into trouble for that in his case. Defendant persisted in denying that he took the gun or ever touched it, but admitted that a friend of his had taken the gun and Defendant had seen it at the friend's home. The following colloquy ensued:

> **Agent Mostyn**: What are you afraid of? Are you afraid of telling me the truth because you're afraid you're going to admit that you possessed a stolen gun and then all of a sudden we're going to jump up and go, okay, now we're going to arrest you?

> **Defendant**: No. I'm not. – I'm not –

> **Agent Mostyn**: What are you afraid of?

**Defendant:** I'm not afraid of nothing. I'm just trying to tell you – I'm telling – I didn't take the gun, but I was there when the gun came up missing.

When Agent Mostyn pointed out that Defendant's story was starting to change, Defendant agreed that it was and told Agent Mostyn that he would tell him what happened. Defendant then reiterated his explanation that his friend had taken the gun, but provided greater details.

Thereafter, Agent Mostyn began discussing Agent Campbell's case regarding the gun G.G. had obtained. He advised Defendant that although it was not Agent Mostyn's case, Agent Campbell did not believe Defendant's story. Defendant assured Agent Mostyn that he had told Agent Campbell the truth. Agent Mostyn then challenged Defendant on some of the facts Defendant had provided to Agent Campbell and told him that he thought he had a problem with those facts in the federal system. Defendant maintained that he had some knowledge, but no involvement, in the theft of the firearm. When Agent Mostyn told the Defendant that he did not believe he was innocent, Defendant reminded Agent Mostyn: "[I]t's not your case though. That's what you just said." Agent Mostyn advised Defendant that he was Agent Campbell's supervisor and supervised his cases. Defendant responded that he had done nothing wrong. Agent Mostyn told Defendant that he needed to "come clean" because he hadn't told the truth. Defendant responded: "All right. All right. All right." He admitted that he had sold the gun but challenged the assumption that it was stolen. He provided several explanations as to why he did not believe it was stolen, including that his father had not reported it to be stolen and would not do so. He offered to have his father come to the agents if the agents were not as rude as they had allegedly previously been to him. When Agent Mostyn denied being rude to Defendant's father, Defendant stated that they had scared his father. Agent Mostyn pointed out that Defendant, himself, had not been nice to them whereas the agents had been nothing but pleasant to him. Defendant agreed with this statement.

Thereafter, the conversation returned to the gun taken from Defendant's father's home with Defendant continuing to challenge whether it could be considered stolen. Agent Mostyn agreed that the situation was not black and white and that there was a gray area, and told Defendant that it was the prosecutor's decision whether or not to charge a crime. He further advised: "An ATF agent cannot promise you anything, they cannot tell you what will happen to you in the federal court system. Michael, the only thing I can advise you to do is be honest and tell the truth at all times." He told Defendant that the people who told the truth were "the people that get consideration." After summarizing Defendant's version of the events, with Defendant agreeing, correcting, and adding details, Agent Mostyn told Defendant: "I can't promise you you're not going to jail on anything. All I can do is bring the story in. Do you understand what I'm trying to explain to you? When you commit a crime, the cop can never promise that you're not going to jail." Defendant told Agent Mostyn that he knew of cops who made that type of promise.

Defendant then told Agent Mostyn that Agent Campbell had been a "dink" and "mean" to him while questioning Defendant at his aunt's house in front of his family. He nonetheless promised that he would call Agent Campbell and tell him the truth. When Agent Mostyn described the "truth" as Defendant's statement that he stole the gun and sold it to G.G., Defendant corrected him and told him he did not really steal the gun because it had been given to him by his father. Agent Mostyn again confronted Defendant with his belief that Defendant stole the gun and sold it, and Defendant appeared to agree with this belief but did not affirmatively adopt this version of the events. Defendant advised Agent Mostyn that he would call up Agent Campbell, and thanked Agent Mostyn for coming up and telling him about it, pointing out that "as least you were more straight up than the other guy," apparently referring to Agent Campbell.

Agent Mostyn asked additional questions with regard to which Defendant generally denied having any knowledge or information, except to offer additional details incriminating G.G. At approximately twenty-nine minutes into the interview, Defendant asked, "Can I go?" to which Agent Mostyn responded, "I'm still finishing up the [G.G.]

thing." The Government has advised that it will not seek to admit Defendant's statements after this point.

At the time of the interview, there was an outstanding state court warrant for Defendant's arrest. Trooper Nally and Agent Mostyn were aware of the warrant, and there was a pre-existing plan for two uniformed police officers to arrive at the trailer park and arrest Defendant after Agent Mostyn interviewed him. Neither Trooper Nally nor Agent Mostyn, however, conveyed to Defendant that there was either an outstanding arrest warrant or that he was going to be arrested, although Trooper Nally testified that, if Defendant had tried to leave prior to the arrival of the uniformed police officers, he would have arrested Defendant. At the conclusion of the October 8, 2010 interview, state law enforcement officers arrested Defendant.

Throughout the interview, Defendant spoke at a slightly hurried pace with normal diction and a normal range of vocabulary. His answers were generally responsive to the questions posed and he did not appear to be slow in processing what he was being told. He did not display any obvious intellectual deficits, confusion, or intimidation. Although Agent Mostyn was at times confrontational with Defendant, the interview generally proceeded in a conversational tone, laced with profanity by both participants, with Defendant referring to Agent Mostyn at times as "dude" and "buddy." Agent Mostyn was not in uniform, never displayed a weapon, did not physically touch Defendant, and did not physically threatened him, or display a show of force.

### C.    January 20, 2011 Grand Jury Testimony.

Defendant testified before a grand jury on January 20, 2011 for approximately ten minutes. He was subject to an order of detention at the time. Assistant U.S. Attorney Perella questioned Defendant, inquiring as to Defendant's understanding of the proceeding and his rights with respect thereto as follows:

Q.    And, Michael, you – you – I understand that you are now serving some jail time in – well, before I get to that, let me just explain to you your – your rights. Do you understand that the grand jury's investigating potential violations of federal firearms laws?

A.    Yup.

8

Q. And do you understand that there are no agreements between yourself and the government regarding your testimony today?

A. Yup.

Q. And do you understand that the government has made no promises in exchange for your testimony today?

A. Yes.

Q. And do you understand that you have a right to have a lawyer outside the grand jury room, and if you did have a lawyer present, you could step outside the grand jury room to confer with your lawyer?

A. Yup.

Q. And – and do you understand if you couldn't afford counsel, the court may appoint one for you?

A. Yeah. Yup.

Q. And do you understand that you may refuse to answer any questions if a truthful answer to the question would tend to incriminate you?

A. Okay. Yeah.

Q. And do you understand that anything you say may be used against you in a subsequent criminal proceeding?

A. Okay.

Q. Yes, you understand that?

A. Yup.

Q. And do you understand that your testimony is being recorded by the court reporter? Do you understand that?

A. Yeah.

Q. And if you fail to testify truthfully, you can be prosecuted for perjury, making false statements, and/or obstruction of justice?

A. Yes.

(Government's Ex. C at 1-3.)

Following the discussion of Defendant's rights, Assistant U.S. Attorney Perella asked Defendant about his interactions with G.G., S.T., and R.A. relating to a firearm that was kept at the home of Defendant's father. There is no other evidence before the court with regard to this proceeding.

### D. October 10, 2011 Statements.

On October 10, 2011, Agents Campbell and Mostyn arrested Defendant outside of the Caledonia County Courthouse at approximately 4:00 p.m. The reason for Defendant's presence at the Caledonia Courthouse is unknown, but it appears from the subsequent interview that he was being released after a period of incarceration for approximately sixty days. After advising Defendant that he was under arrest for federal gun charges, Agent Mostyn transported Defendant to an ATF office in handcuffs. Defendant asked if he could smoke a cigarette and was told he probably could in the transport vehicle. He questioned why he had not been arrested while he was incarcerated by the State of Vermont and Agent Mostyn explained that this charge was a federal charge. He told Defendant: "Now I'm going to treat you like a gentleman just like I did last time all right, sit back. As long as you treat me like one, I'll treat you like one too, all right?" Agent Mostyn explained to Defendant that he would be processed at the ATF office, and would then be taken back to jail. When Defendant asked: "When do I go to court on this stuff?" Agent Mostyn advised that because it was a federal holiday, it would likely be the following day. Defendant asked several additional questions, and when Agent Mostyn explained that he would need to do "*Miranda* stuff and things" like the last time, Defendant replied that he was "expecting it way before now."

En route, Agent Mostyn explained that he would give Defendant two sets of *Miranda* warnings – one state and one federal. He then read Defendant his *Miranda* rights twice; first from a state *Miranda* waiver form[3] and then from a federal ATF

---

[3] The state *Miranda* waiver form states:

> 1. You have the right to remain silent.
>
> 2. Anything you say can and will be used against you in a court of law.
>
> 3. You have the right to talk to a lawyer before questioning and to have a lawyer present with you during questioning.
>
> 4. If you cannot afford to hire a lawyer, one will be appointed to represent you at public expense before any questioning, if you wish. In Vermont, that is called a Public Defender.

*Miranda* waiver form.[4] Defendant twice stated that he understood the *Miranda* warnings. Agent Mostyn asked Defendant if he felt like talking, to which Defendant responded: "About what?" Agent Mostyn responded "Doesn't matter to me, anything you want."

Agent Mostyn asked Defendant if he had pressured or threatened him, to which Defendant responded, "[n]o sir." In response to a question of whether anything had been promised, Defendant stated: "Yes, you have. . . . You said I wouldn't get arrested over this."[5] Agent Mostyn immediately responded: "Oh I never said that. I never said that at all. . . . I told you that you had some culpability in this. You may not be the main guy in this whole scenario but you would have to answer for your stuff, right?" In response, Defendant agreed he may have gotten it wrong and acknowledged, "[n]o you didn't promise me." Agent Mostyn reminded Defendant that Agent Mostyn had told him that the only person who could promise him anything was a prosecutor or a judge and that if a cop ever promised him anything, he is a liar. Defendant agreed that he had not been promised anything.

---

5. If you decide to answer questions, you may stop the questioning at any time.

(Government's Ex. H.)

[4] The federal ATF *Miranda* waiver form states:

> You have the right to remain silent.
>
> Anything you say can be used against you in court.
>
> You have the right to talk to a lawyer before we ask you any questions and to have a lawyer with you during questioning.
>
> If you cannot afford a lawyer, one will be appointed for you if you wish before any questioning begins.
>
> If you decide to answer any questions now without a lawyer present, you have the right to stop answering at any time.

(Government's Ex. F.)

[5] Although Defendant's reference is unclear, it appears he is referring to the October 8, 2010 interview.

Defendant asked the agents if there was going to be only one federal charge against him and they told him there may be two: possession of a stolen firearm and being an illegal user of controlled substances in possession of a firearm. Defendant asked: "Yeah but how was the gun stolen?" to which Agent Campbell replied, "I said we're not going to get into that all right." Defendant persisted with questions regarding how the gun could be stolen. Agent Campbell acknowledged that Defendant had some "legitimate questions" but he was not going to discuss them. Defendant asked when there would be a discussion and asked if Agent Campbell was his lawyer. Agent Campbell advised him that he was a federal ATF agent and reminded Defendant that they had met approximately a year and a half ago. Defendant stated that he recalled the visit to his aunt's trailer. He then expressed his belief that it was "crazy" for the federal agents to wait until he was released when they could have arrested him while he was incarcerated.

Approximately five minutes after Agent Mostyn read Defendant *Miranda* warnings, they stopped at a store. Agent Mostyn remained in the transport vehicle with Defendant while Agent Campbell entered the store. Defendant declined Agent Campbell's offer to get him a beverage or some food. Agent Mostyn, however, instructed Agent Campbell to buy Defendant cigarettes. Defendant told Agent Mostyn: "I'm just trying to ask you questions you know?" Agent Mostyn explained that Defendant needed to sign both the federal ATF and state *Miranda* waiver forms before Agent Mostyn could answer any of Defendant's questions. Defendant replied: "So if I waive you the rights, you can answer my questions?" Agent Mostyn explained that they could have a "dialogue back and forth" but that Defendant always had the right not to answer any question that he did not want to and that Agent Mostyn actually did not have any questions for him because he already knew what he needed to know. Defendant responded: "Yeah, like I got a couple of questions for you but I expect you to answer me." Agent Mostyn assured him that he would.

Agent Mostyn again read both the state and federal ATF *Miranda* waivers. In response to the first waiver, Defendant confirmed that he had not been threatened or

promised anything and that he was willing to talk to Agent Mostyn. In response to the second waiver, Defendant again raised the issue of whether he had been promised anything and acknowledged that Agent Mostyn had "[n]ot really promised" but had said Defendant would not have to worry about it. Agent Mostyn said he told Defendant "exactly how things go in these cases," to which Defendant said "Right" and said that he was willing to talk. Defendant printed his name on both waiver forms, explaining that he did not write in cursive and mentioning that he had a learning disability and was on an IEP. Agent Mostyn asked: "So you completely understand you do not have to say anything to me and you don't have to talk to me right?" Defendant confirmed that he understood and that it was his decision whether to talk. Defendant then asked Agent Mostyn several questions about what would happen next which Agent Mostyn answered. Defendant replied, "Okay, that's not too bad" and asked additional questions which were answered.

When Agent Campbell returned to the transport vehicle, Agent Mostyn advised him that Defendant had waived his *Miranda* rights and executed both waiver forms. In the course of this explanation, Agent Mostyn again read the forms aloud and Defendant again confirmed his answers so that Agent Campbell could sign the forms as a witness.

Thereafter, Defendant again raised the issue of how a gun that was never reported stolen could be a stolen gun. Agent Mostyn provided the example of a homeowner whose home is broken into while he is on vacation and a firearm is taken from it but who does not actually know the firearm is stolen. The person who stole the gun later gets caught with the firearm which is then treated as a stolen firearm. Defendant pointed out that his father had inherited the gun in question. He advised that he had additional questions but would wait.

After a more general discussion, Defendant again challenged how he could be charged with possession of a stolen gun when it had been left to his dad as an inheritance by his stepmother. When Agent Mostyn pointed out that it had not been left to Defendant, Defendant stated: "Well not really to my dad. But you know she left it to us

as a family, you know what I mean." He added that when this inheritance took place, he did not "have any felonies or anything like that."

When they arrived at the ATF office, Defendant was asked to read his *Miranda* rights from a card. He read slowly, but accurately, and without hesitation or mispronunciation. Agent Mostyn then went through each right individually, explaining it further, and asked Defendant to confirm that he understood. Defendant stated that he did, noting, "I can stop at any time, right?" to which Agent Mostyn replied: "You can stop at any time."

Agent Campbell credibly testified that he did not detect that Defendant suffered from any intellectual deficiencies during the course of the October 10, 2011 interview. At one point in the interview, law enforcement officers had Defendant demonstrate events and describe them in his own words to confirm that he was not simply repeating accusations.

### E.    Dr. Willmuth's Opinions and Conclusions.

In seeking suppression of his statements, Defendant relies upon the opinions of Dr. Willmuth to support his contention that he was incapable of understanding his *Miranda* rights, that he was incapable of validly waiving those rights, and that his statements were involuntary. The Government does not challenge Dr. Willmuth's qualifications to offer an expert opinion. Although the court previously found Dr. Willmuth qualified to render an opinion regarding Defendant's competency, it gave her opinions less weight than those of the Government's expert, William Ryan, Ph.D., who testified at Defendant's competency hearing, due to differences in their experience and qualifications. *See Norrie*, at 2012 WL 4955211, at *6 (Dr. Ryan had evaluated many defendants with mental retardation for competency; prior to Defendant's evaluation, Dr. Willmuth had evaluated only one. Dr. Ryan had testified for both prosecution and defense in more than sixty competency evaluations. Dr. Willmuth had only testified for defendants and had

14

testified five times in federal court and approximately two times a year in state court on issues of competency).[6]

Defendant has not identified a single case in which a court has found Dr. Willmuth qualified to testify as an expert regarding whether a criminal defendant is able to understand and waive his or her *Miranda* rights and provide voluntary statements. However, for purposes of the pending motion, in light of the lack of objection by the Government, the court will consider Dr. Willmuth's opinions as those rendered by an expert witness without ruling on whether she is in fact qualified as an expert to render them.

In her initial report, Dr. Willmuth noted that she advised Defendant as follows:

> Mr. Norrie was advised that he could refuse or terminate the evaluation at any time, that the findings might or might not be helpful to his case, that no doctor/patient relationship was being established, that no treatment would be provided, that he would not be given results from this evaluation by this examiner. He was advised regarding the limits of confidentiality. He was told that he could refuse to respond to specific questions and that if he did so his refusal to respond would be noted. He demonstrated an adequate understanding of this information after it had been explained to him and agreed to proceed with the evaluation.

Defendant's Ex. 2 at 1. Dr. Willmuth then performed two separate evaluations of Defendant, the first on March 19, 2012, and the second in November 2012. She performed the second evaluation without notice to either the court or the prosecution. Dr. Willmuth also spoke to Defendant during court proceedings. Dr. Willmuth administered an array of psychological tests and assessments to Defendant to evaluate his general intellectual functioning, cognitive abilities, and his understanding of *Miranda* rights.

---

[6] Dr. Ryan did not testify in conjunction with the motion to suppress. Defendant nonetheless notes that, during his competency hearing, Dr. Ryan testified that it was "correct" that he did not "take any exceptions to the conclusions that [Dr. Willmuth] draws in [her report.]" (Doc. 46 at 16.) Dr. Ryan's response was to a general question, not directed to the specific conclusion in Dr. Willmuth's report regarding whether Defendant would have understood his *Miranda* rights. Dr. Ryan did not reach, adopt, or endorse any conclusion regarding Defendant's ability to understand or waive his *Miranda* rights or whether the statements he provided to law enforcement were voluntary.

Two measurements Dr. Willmuth performed are of particular relevance to the motion to suppress: (1) the Gudjonsson Suggestibility Scale, which is designed to measure Defendant's suggestibility and compliance; and (2) Thomas Grisso's *Instruments for Assessing Understanding & Appreciation of Miranda Rights* (the "Grisso test"), which is designed to assess Defendant's understanding and appreciation of his *Miranda* rights.[7]

In her March 19, 2012 report, Dr. Willmuth provided the following opinion:

Medical record review, interview and behavioral observations and formal test results all support a diagnosis of Mild Mental Retardation with an IQ that is likely in the low to mid 60[]s. History and current functioning also suggest that he has attentional deficits and particular difficulty processing verbal information. His language skills are poor and he has difficulty listening to and processing oral verbal information. His ability to hold information in attention and his processing speed are both extremely low. Testing also indicates that he has a high level of suggestibility and is likely an individual who will and does change his story when he feels threatened and isolated. By history and self-report he is frightened about being alone, likely feels easily intimidated by threatening males and is eager to please in any way that he can in order to escape a situation in which he feels trapped and threatened. He has always been easily led and interrogation is just one more situation in which this appears to be the case.

Defendant's Ex. 2 at 10.

In her testimony, Dr. Willmuth echoed some of her observations in her report, noting that Defendant "felt frightened if not certainly very distressed, very anxious, if not terrified" (Doc. 57 at 105) during his interviews by law enforcement. Based upon these and other observations of Defendant, as well as upon her testing and medical and educational records review, Dr. Willmuth opined that:

---

[7] Dr. Willmuth did not administer the Grisso test to Defendant as part of her initial evaluation of Defendant, although she asserts the test is integral to her opinions. She could not explain why she failed to do so. Although Dr. Willmuth initially testified that she had administered the Grisso test on several occasions, when the court asked her to provide a list of cases in which she had done so and a list of individuals to whom she had administered the test, she submitted an affidavit stating that she had not administered the test in the past five years and did not maintain records beyond that point.

Given Mr. Norrie's limited cognitive abilities and particularly limited verbal functioning and tendency not to tell people when he does not understand what he has heard, I think it is quite likely that he would not truly have understood his rights when they are provided to him. It is also very likely that in any situation he is much more likely to be [a] follower than a leader and unlikely to initiate independently. I have no way of knowing which of his many contradictory stories may be accurate and truthful. I do think that it is very likely, based on his behavior and test results, that he did and does tend to agree with whatever is being suggested to him as the truth in a situation where he likely felt isolated and threatened and knew that he was at risk of incarceration. It is important to be aware that he likely frequently does not understand what []is being said to him and is unlikely to say so. It is likely that he processes information much more slowly than most people and that he consequently has difficulty following complex conversations and understanding information that is presented to him orally.

In summary it is my opinion based on all of the information that I have available to me that Mr. Norrie's confessions may well be false and that he likely does not fully understand his rights and situation as clearly as he appears to do so. It is also my opinion that it is likely that following proceedings in a courtroom would be problematic for him.

Defendant's Ex. 2 at 10-11.

Dr. Willmuth testified that Defendant's verbal processing skills were so limited that he did not even understand what a "right" or "obligation" was and went so far as to claim Defendant "doesn't get any of it." (Doc. 57 at 37.) She further testified that in terms of suggestibility, there is no point at which Defendant will say he does not know an answer to a question. Instead, he will provide an answer whether or not he has the information sought. She opined that Defendant is virtually unable to read.[8]

---

[8] In her report, Dr. Willmuth stated that "[Defendant] is unable to read a paragraph." Defendant's Ex. 2 at 9. Dr. Willmuth further testified that Defendant reads at below a first grade level. When confronted with a videotape depicting Defendant reading *Miranda* warnings with a proficiency that appears to exceed that of a first grader, Dr. Willmuth opined that there was a level of memorization involved. She nonetheless acknowledged that there are different versions of *Miranda* warnings, and she did not have any specific evidence that Defendant had previously memorized the version he was reading.

In determining what weight, if any, to give Dr. Willmuth's opinions, the court notes first and foremost that Dr. Willmuth's characterization of Defendant's conduct and demeanor in the face of law enforcement questioning is markedly different from the interviews themselves.[9] Far from appearing terrified and confused, Defendant revealed almost no sign of emotional or mental distress, and, indeed, appeared relatively comfortable in the presence of law enforcement with whom he has had considerable experience. He did not speak with hesitation or obvious intellectual deficits, and his answers were largely responsive to the questions posed. Defendant appeared to have a normal range of vocabulary and read fluently, albeit slowly, and with apparent comprehension of the material read.

Throughout the interviews, Defendant challenged law enforcement's version of the events, persisting in his theory that a firearm could not be stolen if it was not reported stolen despite numerous attempts by law enforcement officers to convince him this fact was unimportant. He also stated first that his father, and later the entire family, had inherited the firearm and had done so at a time when Defendant did not have any felonies. Rather than telling law enforcement what they wanted to hear, these theories were intended to dispel the evidence of guilt against Defendant.

In the interview in Trooper Nally's truck, Defendant referred to Agent Mostyn as "buddy" and "dude" and told him, without prompting, that his professional colleague, Agent Campbell, had been a "dink" and "mean" to him and had embarrassed him in front of his family. He also chastened Agent Mostyn for "stressing out" Defendant's girlfriend and scaring his father and told him that he could talk to this father further if he was not rude to him. These statements do not evidence an extreme level of intimidation or an excessive desire to conform and please.

When Agent Mostyn questioned Defendant's innocence in Agent Campbell's investigation of the handgun provided to G.G., Defendant reminded Agent Mostyn that it

---

[9] "[A] court may credit video footage over a party's recollection of events." *See Pietrangelo v. Alvas Corp.*, 2010 WL 5156385, at *5 (D. Vt. Dec. 14, 2010) (citing *Scott v. Harris*, 550 U.S. 372, 380-81 (2007)).

18

was not his case. Defendant referred to Agent Mostyn's statements on October 8, 2010 that he was not prepared to arrest Defendant and questioned, over a year later, whether these statements could be considered a promise. This evidence supports a conclusion that Defendant is able to understand what he has told, to retain that information, and to use it to his advantage.

Indeed, Defendant used the interviews with law enforcement to extract information that was useful to him in assessing his criminal liability and in order to understand what might happen next. He freely questioned law enforcement and at one point told Agent Mostyn that he expected his questions to be answered. Although Defendant changed his version of the events frequently, he generally did so in order to dispel any suggestion of his own culpability and to deflect guilt upon another person. He expressed an ability and willingness to tell law enforcement that he had no helpful information to offer them. There is no evidence that Defendant accepted, adopted, or endorsed law enforcement's conclusions without first challenging them and testing the nature and weight of evidence against him. Finally, there is no evidence that, at any point, Defendant was confused regarding the numerous sets of *Miranda* warnings he received and the import of a waiver.

Because Dr. Willmuth's characterization of Defendant's behavior and intellectual deficits in the face of law enforcement questioning is demonstrably inconsistent with the interviews themselves, the court finds her opinions derived therefrom generally unreliable and unpersuasive.

Second, the court questions whether the tests administered by Dr. Willmuth are a reliable indicator of either Defendant's capacity to understand and waive his *Miranda* rights, or the voluntariness of his statements. Dr. Willmuth explained that the results of the Gudjonsson Suggestibility Scale indicated that Defendant "yielded" and "shifted"[10] at

---

[10] According to Dr. Willmuth, the term "yield" "mean[s] how many times does this person when they are asked was it red or was it blue and that information isn't in the story they'll pick one or the other . . . they won't say, I don't know." (Doc. 57 at 48.) The term "shift" refers to when persons "change their answer." *Id.*

a rate higher than most mentally retarded persons, who as a class, allegedly yield and shift at a greater rate than the rest of the population. Based on this information, Dr. Willmuth concluded that Defendant's "ability to sort of reason and certainly to understand anything that is complex or abstract is very limited." (Doc. 57 at 15.)

Defendant may have yielded and shifted at a significant rate during Dr. Willmuth's testing, but he did not do so in the actual interviews. To the contrary, Defendant consistently demonstrated an ability to disagree with law enforcement, to withhold information, to change his version of the events when confronted with inconsistencies or challenged regarding his truthfulness, and to provide details that generally incriminated others rather than incriminating Defendant. There is simply no evidence to support a conclusion that he rotely adopted or agreed to what law enforcement told him.

As for the Grisso test, Dr. Willmuth testified that Defendant's scores on that test placed him close to other adult offenders regarding vocabulary, but significantly below other adult offenders regarding his understanding of the function of *Miranda* rights. As an initial matter, Dr. Willmuth appears to lack sufficient experience with respect to the Grisso test to testify as an expert regarding its results. It is also concerning that this allegedly critical test was administered for the first time during a hiatus in the court's evidentiary hearing. The reliability of the Grisso test suffers further from its administration over a year after Defendant executed the *Miranda* waivers. *See Garner v. Mitchell*, 557 F.3d 257, 270 (6th Cir. 2009) (en banc) (explaining that "there is simply no way of telling whether [petitioner's] Grisso test scores are an accurate indicator of his ability to understand the warnings when police administered the warnings [six years earlier]").

Even when properly administered, courts have rejected the Grisso test as dispositive in determining whether a defendant knowingly waived his or her rights. *See, e.g., Garner*, 557 F.3d at 262 (finding that "conduct during, and leading up to, the interrogation indicate that [defendant] understood and appreciated his *Miranda* rights before executing the waiver" despite the results of a Grisso test indicating that the

20

defendant could not understand his rights); *Smith v. Mullin*, 379 F.3d 919, 933 (10th Cir. 2004) (finding defendant's *Miranda* waiver was knowing and voluntary despite results of a Grisso test that supported psychologist's opinion that defendant was incapable of waiving his *Miranda* rights); *Bone v. Polk*, 2010 WL 2733333, at \*24 (M.D.N.C. July 9, 2010) (acknowledging that experts for both the state and the defendant "concluded that Petitioner did not demonstrate an understanding of his *Miranda* rights based on their testing," but nonetheless finding that "the Court is not compelled to accept their conclusion"); *United States v. Jennings*, 2007 WL 1589505, at \*\*2, 6 (M.D. Ala. March 2, 2007) (finding "government met its burden of proving that defendant competently and intelligently waived his right to counsel prior to giving both oral and written statements" despite psychologist's opinion based on a Grisso test that "it was highly unlikely that defendant fully comprehended the literal meaning of his *Miranda* rights, and more importantly, the implications of waiving them").

Third, Dr. Willmuth opined in her report that Defendant "demonstrated an adequate understanding" of her relatively complicated series of advice and warnings to him at the commencement of her evaluation. If there were any limitations in Defendant's ability to understand, she did not initially note them. In her testimony, however, Dr. Willmuth qualified this observation, stating that Defendant's understanding of her advice and warnings was only adequate in the context of her role. In her post-hearing affidavit, she qualified her statement even further, explaining that her "notes reflect that [Defendant] had a slight understanding of the consent and confidentiality provision." (Doc. 65-1 at ¶ 2.)

The Government persuasively argues that this appears to be "a thinly veiled attempt to rehabilitate Dr. Willmuth without subjecting her to additional cross-examination." (Doc. 66 at 1.) As the Government points out, Dr. Willmuth had ample opportunity to consult her notes in the course of the court's evidentiary hearing and to change the unequivocal statement she made in her report regarding the nature and degree of Defendant's understanding of her advice and warnings. She made material corrections

to her statement only after the court's evidentiary hearing was concluded and, in this respect, arguably offered her opinions more as an advocate than as a disinterested expert.

Fourth, Dr. Willmuth's opinions are inconsistent with Defendant's criminal history which reflects a series of court appearances during which his competency was never apparently challenged. They are also inconsistent with her testimony during the competency hearing wherein "Dr. Willmuth agreed that Defendant understood the charges, the lawyers' roles, what a plea was, and the difference between a plea and a jury trial." *Norrie*, 2012 WL 4955211, at *6.[11] Material inconsistencies in an alleged expert opinion are sufficient grounds, alone, to either reject it or afford it little weight. *See, e.g., Micheli v. Astrue*, 2012 WL 5259138, at *2 (2d Cir. Oct. 25, 2012) ("A physician's opinions are given less weight when his opinions are internally inconsistent."); *Jones v. Heckler*, 614 F. Supp. 277, 280 (D. Vt. 1985) (finding a treating physician's opinions were not "sufficiently probative of plaintiff's medical condition . . . because those opinions are, in fact, internally inconsistent and are contradicted by other medical evidence of record").

Finally, although Dr. Willmuth asserts that there is a substantial discrepancy between Defendant's perceived understanding and his actual understanding, she could not explain, from a neurological perspective, why Defendant's language skills would exceed his comprehension. She acknowledged that this proposition was counterintuitive in light of how children begin to speak and how people learn foreign languages, but

---

[11] At the competency hearing, Dr. Willmuth further testified that she "agrees with Dr. Ryan's conclusions regarding Defendant's competency," *Norrie*, 2012 WL 4955211, at *6, which include conclusions that:

> [Defendant] is capable of comprehending the seriousness of his case and the recommendations of defense counsel. He is capable of communicating with counsel, weighing the merits of various defenses, and making decisions regarding numerous constitutional protections such as his right to trial, his right to an attorney, his right to enter into a plea, and his right to call witness[es], etc. He is capable of testifying in his own defense and speaking during sentencing proceedings should it be necessary.

*Id.* at *4 (internal quotation marks omitted).

explained that "we're not talking about somebody with a normal brain[,]" and pointed to test scores, which she claims support this conclusion. (Doc. 57 at 64-65.) The test scores are not particularly revealing without further explanation,[12] and leave the court with a bald assertion that Defendant's brain is different from the norm without any *scientific* explanation as to why Defendant's apparent verbal and reading skills, and his apparent comprehension, as depicted in the audio and videotapes, mask his true deficits.

For the foregoing reasons, the court accords Dr. Willmuth's opinions scant weight in analyzing whether Defendant understood and knowingly and intelligently waived his *Miranda* rights and in analyzing whether Defendant's statements were voluntary.

## II.    Conclusions of Law and Analysis.

Defendant seeks suppression of his statements during the October 8, 2010 and October 10, 2011 interviews and during his grand jury testimony on January 20, 2011. He argues that all of his statements were the product of custodial interrogation that was either bereft of *Miranda* warnings or in which *Miranda* warnings were given, but his waivers were invalid. He also contends that suppression is required because none of his statements were voluntary.

### A.    Whether the October 8, 2010 Interview Was Custodial.

Under *Miranda*, a police officer may not question a suspect who has been taken "into custody" without first warning the suspect that he or she:

> has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966). If no warning is given to a suspect who is in custody, the prosecution may not use statements obtained during the interrogation in its case-in-chief. *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004).

---

[12] When asked, Dr. Willmuth pointed to her report, which explained that "[a] speech/language evaluation, dated 10-07-2004, found that [Defendant] had vocabulary skills within the low average range, expressive vocabulary skills within the moderately low range, and that his auditory reasoning and processing skills were impaired. He was seen as eligible for services because of significant deficit in listening comprehension." (Defendant's Ex. 2 at 3-4.)

"A criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation." *United States v. Ramos*, 2012 WL 1854747, at *11 (D. Vt. May 21, 2012); *see also United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Davis*, 792 F.2d 1299, 1309 (5th Cir. 1986) ("[Defendant] had the burden of proving that he was under arrest or in custody[.]").

To determine whether an interrogation is custodial, the court considers first whether "a reasonable person [would] have felt he or she was at liberty to terminate the interrogation and leave[.]" *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The court must "examine all of the circumstances surrounding the interrogation." *Id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

> Those circumstances include, inter alia, the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; whether officers told the suspect he was free to leave or under suspicion[.] . . . The circumstances also include . . . the nature of the questions asked.

*United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011) (internal citations omitted).

"The free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody." *Newton*, 369 F.3d at 670. "The 'ultimate inquiry' for determining *Miranda* custody . . . [is] 'whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)).

Defendant claims that he was in custody and entitled to *Miranda* warnings during the October 8, 2010 interview because Agent Mostyn deceived him regarding the possibility of arrest and the purpose of the interview. The Government counters that the interview had none of the hallmarks of custodial interrogation. The court agrees.

Defendant voluntarily agreed to get into Trooper Nally's truck at Agent Mostyn's request. Defendant's first question upon entry into the truck, after asking whether he could smoke, was whether he was going to be arrested. Agent Mostyn's rhetorical question in response: "Dude, . . . do we look like we can even arrest you?" would have allayed a reasonable person's fear that an arrest was imminent. It would not, however, have led that same reasonable person to believe he or she was already under arrest. Instead, it created the opposite impression -- that the Defendant was free to leave the interview at any time. Agent Mostyn's further statements to Defendant that he was not under arrest and was not obligated to answer any questions, and that he would rather have Defendant leave the interview than lie to him, underscore this conclusion. *See United States v. Crawford*, 372 F.3d 1048, 1061 (9th Cir. 2004) (noting that defendant was not in custody, was told that he was not under arrest, and was free to leave, the court found that "nothing about the environment in which the statement was given or the manner in which Defendant was questioned suggests coercive conduct by the police"); *United States v. Burns*, 15 F.3d 211, 216 (1st Cir. 1994) (finding the setting of the interview was not inherently coercive and defendant's statements were voluntary where defendant was "informed that she was not under arrest" and had been "advised that she was under no obligation to speak").

Dr. Willmuth's opinion that Defendant was incapable of understanding that he was not under arrest and was not obligated to answer questions is not only unfounded,[13] but is irrelevant in determining whether Defendant was in custody. *See Yarborough v. Alvarado*, 541 U.S. 652, 667-68 (2004) (explaining that "[t]he *Miranda* custody inquiry is an objective test . . . designed to give clear guidance to the police" and that police

---

[13] Dr. Willmuth testified that it was "very unlikely" that Defendant "would understand a word like [']obligation[']given what [she] know[s] about his level of vocabulary, his reading, writing and language abilities which are . . . below the level at which 99 percent of the population functions." (Doc. 57 at 59.) The interview, itself, belies this conclusion. In any event, Agent Mostyn told Defendant in a number of ways that he did not need to answer Agent Mostyn's questions, and Defendant apparently heeded this advice because, on several occasions, he either denied having any relevant information or told Agent Mostyn that he had already disclosed all that he knew.

officers are not required "to consider these contingent psychological factors when deciding when suspects should be advised of their *Miranda* rights"); *see also United States v. Mason*, 660 F. Supp. 2d 479, 485 (W.D.N.Y. 2009) (explaining in dicta that "testimony as to defendant's mental limitations is irrelevant to the question of whether defendant was 'in custody' at the time of his interrogations").

Whether in fact Defendant would have been free to leave is also irrelevant as neither Agent Mostyn nor Trooper Nally informed Defendant of the plan to arrest him after the interview. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (finding defendant was not in custody even though officer had decided that defendant would be arrested, explaining that the officer "never communicated his intention" to the defendant); *United States v. Weisinger*, 2012 WL 6164306, at *7 (D. Vt. Dec. 11, 2012) ("Because the detectives did not prospectively reveal to Defendant their plan to arrest him, he cannot rely on their undisclosed intent to establish that he was in custody during the interview itself.").

As for Defendant's argument that Agent Mostyn was being deceptive, strictly speaking, it was true that Agent Mostyn did not intend to arrest Defendant that day and it is also true that nothing Defendant said during the interview gave rise to his arrest. Instead, Defendant was arrested pursuant to an outstanding state court warrant. Agent Mostyn's further statement to Defendant that he was not there to discuss the matter Defendant had discussed with Agent Campbell was also not patently false or misleading. Agent Mostyn discussed a number of firearms issues with Defendant, including his belief that Defendant had been untruthful with Agent Campbell. When he did so, Defendant reminded Agent Mostyn that it was not his case. There is no evidence that Defendant agreed to the interview after being deceived regarding the nature of the matters under investigation. *See Colorado v. Spring*, 479 U.S. 564, 576-77 (1987) (holding that law enforcement's failure to inform defendant that he could be questioned about murder in the course of an interview regarding an alleged firearms violation did not render invalid defendant's decision to waive his privilege against self-incrimination); *see also United States v. Mitchell*, 966 F.2d 92, 100 (2d Cir. 1992) ("To prevail on a claim of trickery and

deception [defendant] must produce clear and convincing evidence that the [officers] affirmatively misled [him] as to the true nature of [their] investigation.") (citation and internal quotation marks omitted).

The nature and location of the interview also support a conclusion that Defendant was not in custody. The interview took place in the cab of Trooper Nally's truck, just outside of the home of Defendant's girlfriend, where he was staying at the time, and during the interview Defendant's companions remained in proximity to the truck. *See United States v. Bassignani*, 575 F.3d 879, 885 (9th Cir. 2009) ("We have held that an interrogation conducted in familiar surroundings weighs against a finding that defendant was in custody."); *United States v. Zaleski*, 559 F. Supp. 2d 178, 189 (D. Conn. 2008) ("Courts are generally more likely to find interrogation to be non-custodial when it takes place in familiar surroundings, or in public, rather than at a police station."); *United States v. Cunningham*, 2012 WL 369923, at *5 (D. Vt. Feb. 3, 2012) (holding defendant was not in custody when interviewed by law enforcement on his back porch in proximity to neighbors who were also outside).

While Defendant sat in Trooper Nally's truck, he was not handcuffed or otherwise restrained. The doors to the truck were not locked and it appears that at least one window to the truck was rolled down because Defendant was smoking. *See Newton*, 369 F.3d at 675 ("Handcuffs are generally recognized as a hallmark of a formal arrest."); *Green v. Scully*, 850 F.2d 894, 903 (2d Cir. 1988) (noting that suspect was not handcuffed during the interrogation in support of conclusion that confession was not coerced). No weapons were drawn, there was no other show of force, and Defendant was neither physically touched nor threatened. *See, e.g.*, *United States v. Sugrim*, 732 F.2d 25, 28 (2d Cir. 1984) ("Factors which strongly suggest [a person was not free to walk away] are, for example, the display of a weapon, physical touching of the person by the officer and language or tone indicating a show of authority that may compel compliance with the officer's request."); *United States v. Smith*, 2012 WL 5187922, at *4 (D. Vt. Oct. 18, 2012) (denying motion to suppress, the court noted that there was no "show of force to foster Defendant's cooperation or induce him to speak against his will").

The interview proceeded in a conversational manner with Defendant freely asking as well as answering questions. The Government does not seek to introduce Defendant's statements after Agent Mostyn affirmatively declined Defendant's request to leave the truck because Agent Mostyn was not finished with his questions.

"Decisions in [the Second Circuit] have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave." *United States v. Mitchell*, 966 F.2d 92, 98 (2d Cir. 1992). Here, no such message was conveyed until approximately twenty-nine minutes into the October 8, 2010 interview. Prior to that point, a reasonable person in Defendant's position would have felt free to terminate or leave the interview. *See Newton*, 369 F.3d at 672 (holding that if "a reasonable person would have thought he was free to leave the police encounter at issue[,]" no *Miranda* warnings are required and the suppression inquiry need not proceed further). Moreover, nothing law enforcement said or did during the October 8, 2010 interview up to the twenty-nine minute mark would support a conclusion that Defendant's freedom of movement was limited commensurate with a formal arrest. *Newton*, 369 F.3d at 670.

For the foregoing reasons, Defendant's motion to suppress his statements during the October 18, 2010 interview on the grounds that he was subjected to custodial interrogation without *Miranda* warnings is DENIED.

**B.      Whether Defendant's Statements During the October 8, 2010 Interview Were Voluntary.**

"The requirement that *Miranda* warnings be given does not, of course, dispense with the voluntariness inquiry." *Dickerson v. United States*, 530 U.S. 428, 433, 444 (2000) ("Over time, our cases recognized two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."). The Government "has the burden of establishing by a preponderance of the evidence . . . that [the defendant's] confession is truly the product of free choice." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). The Supreme Court has held that "coercive

police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986).

"[W]hether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances." *Green*, 850 F.2d at 901; *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). This involves evaluating the characteristics of both the suspect and the interrogation. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 177, 213 (2d Cir. 2008) (explaining that the totality of the circumstances includes "1) the accused's characteristics, 2) the conditions of the interrogation, and 3) the conduct of the police") (quoting *Parsad v. Greiner*, 337 F.3d 175, 183 (2d Cir. 2003)) (internal quotation marks omitted).

With respect to the question of voluntariness, the Supreme Court has recognized "mental condition is surely relevant to an individual's susceptibility to police coercion." *Connelly*, 479 U.S. at 165. However, mental deficiencies alone will not preclude a finding of voluntariness. *Compare United States v. Gaines*, 295 F.3d 293, 299 (2d Cir. 2002) (finding that "an inability to read or write does not, by itself, establish that the suspect is incapable of making a voluntary and intelligent decision"), *and United States v. Nash*, 414 F. Supp. 1213, 1218 (S.D. Tex. 1976) (finding confession admissible when defendant relied only on his subnormal intelligence as demonstrated by his I.Q. of seventy-eight and vocabulary of a fourth grader), *with Reck v. Pate*, 367 U.S. 433, 441 (1961) (finding confession involuntary when suspect was of "subnormal intelligence," had no prior criminal record, and was interrogated over extended period of time leading to illness and hospitalization).

In fact, while the mental and emotional state of a defendant has become "a more significant factor in the 'voluntariness' calculus[,] . . . this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Connelly*, 479 U.S. at 164 (internal citations omitted). The *Connelly* Court acknowledged

that its previous decisions in *Blackburn v. Alabama*, 361 U.S. 199 (1960) and *Townsend v. Sain*, 372 U.S. 293 (1963), found confessions by defendants with diminished mental capacity were involuntary. *See Connelly*, 479 U.S. at 164. However, the Court observed that *Blackburn* and *Townsend* each also had "the integral element of police overreaching." *Id.* Thus, Defendant's mild mental retardation and other challenges are relevant, but not dispositive, in a voluntariness inquiry.

At the time of the October 8, 2010 interview, Defendant was not under any apparent physical or emotional distress, and he advised Agent Mostyn that he was not afraid of anything. He was an adult with considerable experience with police interrogation and the criminal justice system. *See United States v. Spencer*, 995 F.2d 10, 12 (2d Cir. 1993) (ruling that defendant's waiver of counsel was knowing and voluntary, court observed that "this arrest was not his first encounter with the criminal justice system."); *United States v. Boslau*, 632 F.3d 422, 429 (8th Cir. 2011) (citing, among other factors, defendant's experience with the criminal justice system, including a record dating back to 1979, in concluding that there is "little in the record to suggest that [defendant's] will was overborne"); *United States v. Armstrong*, 554 F.3d 1159, 1165 (8th Cir. 2009) (examining whether there is a valid waiver of right to counsel, court should consider the defendant's age, intelligence, and conduct including "the defendant's past contacts with the criminal justice system[.]").

Defendant knew that some interviews concluded with an arrest and others did not and sought to immediately ascertain which direction the October 8, 2010 interview would take. He then used the interview to gain information as well as to provide it. With regard to the latter, he provided relatively detailed information pertaining to the guilt of others, while denying or minimizing his own involvement in the firearms violations under investigation. Neither Defendant's statements nor his conduct were that of someone whose will was overborne or who had succumbed to police intimidation and coercion. *See Fare*, 442 U.S. at 726-27 (holding confession voluntary where the defendant was "not worn down by improper interrogation tactics or lengthy questioning or by trickery or deceit. . . . The officers did not intimidate or threaten respondent in any way. Their

questioning was restrained and free from the abuses that so concerned the court in *Miranda*").

As for the critical element of police overreaching, the only evidence Defendant points to is Agent Mostyn's statement that he and Trooper Nally were not prepared to arrest Defendant and Agent Mostyn's further statement that he was not there to discuss Agent Campbell's investigation. The court has already concluded that these statements do not rise to the level of affirmative misrepresentations, and concludes now that they do not constitute police overreaching. *See Connelly*, 479 U.S. at 170 (holding that voluntariness "has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word") (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. . . . [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements."). Indeed, Defendant fails to point to *any* evidence that he was *compelled* to make statements because he either did not believe he would be arrested or because he believed Agent Campbell's investigation would not be the subject of inquiry. *See Connelly*, 479 U.S. at 164, 167 (holding that "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding" that a confession has been compelled and "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Cause of the Fourteenth Amendment").

Based upon the totality of the circumstances, the court finds that the Government has established by a preponderance of the evidence that Defendant's statements during the October 8, 2010 interview were voluntary. The court thus DENIES Defendant's motion to suppress his October 8, 2010 on voluntariness grounds.

**C.**   **Whether Defendant Was Entitled to *Miranda* Warnings Prior to His January 20, 2011 Grand Jury Testimony and Whether His Statements Were Voluntary.**

Defendant seeks suppression of his grand jury testimony, contending that he was entitled to and was not given complete *Miranda* warning prior to his testimony. He also asserts that prosecutors did not tell him that he was the target of the grand jury investigation, as is required by Justice Department regulations.[14] He seeks suppression of his testimony on the further grounds that his statements were not voluntary.

The Government responds that prosecutors gave Defendant adequate warnings, Defendant understood those warnings, and Defendant voluntarily testified before the grand jury. It contends that there is no constitutionally protected right to "target witness" warnings and Defendant was not the target of the Government's investigation at the time.[15]

A *Miranda* warning is generally not required prior to grand jury testimony. *See United States v. Mandujano*, 425 U.S. 564, 580 (1976) (plurality opinion) ("To extend these concepts [set forth in *Miranda*] to questioning before a grand jury inquiring into criminal activity under the guidance of a judge is an extravagant expansion never remotely contemplated by this Court in *Miranda*[.]"); *see also United States v. Melendez*, 228 F.3d 19, 23 (1st Cir. 2000) ("[S]elf-incriminating statements made by witnesses (whether or not subpoenaed) while testifying in judicial proceedings are admissible against them in later prosecutions notwithstanding the absence of *Miranda* warnings."); *United States v. Weiss*, 752 F.2d 777, 786 (2d Cir. 1985) ("It is now well settled that a witness before a grand jury may not dismiss an indictment for perjury because he was the target of an investigation, or because he was not advised of his *Miranda* rights, or

---

[14] "It is the policy of the Department of Justice to advise a grand jury witness of his or her rights if such witness is a 'target' or 'subject' of a grand jury investigation." United States Attorneys' Manual § 9-11.151. Additionally, the "advice of status of the witness as a target should be repeated on the record[.]" *Id.*

[15] The Government asserts that it was building a case against S.T. at the time and that S.T. had not yet been charged.

because no effective warning of the Fifth Amendment privilege to remain silent was given.") (citations omitted). In fact, providing *Miranda* warnings would overstate a witness's rights because, in many circumstances, grand jury testimony can be compelled. *See United States v. Washington*, 431 U.S. 181, 183 n.2 (1977) (explaining that telling a grand jury witness that he or she has "a right to remain silent" is "an obvious overstatement of [his or her] constitutional rights" and "the very purpose of the grand jury is to elicit testimony, and it can compel answers, by use of contempt powers, to all except self-incriminating questions").

Defendant contends that, "while warning may not be required to be given to individuals subpoenaed to the grand jury who are not in custody, such is not the case with custodial witnesses." (Doc. 64 at 14.) Defendant, however, cites no legal support for this proposition. Courts have concluded that *Miranda* warnings are not required simply because a person is incarcerated for another offense. In *Maryland v. Shatzer*, 130 S. Ct. 1213 (2010), the Supreme Court considered whether an incarcerated individual who was taken from his cell for an interview was necessarily in custody for the purposes of *Miranda*. The Court explained that "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Id.* at 1224. Noting that "[i]nterrogated suspects who have previously been convicted of crime live in prison," the Court concluded that "lawful imprisonment imposed upon conviction of a crime does not create the coercive pressures identified in *Miranda*." *Id.* In so ruling, the Court pointed out that continued detention following the interrogation "did not depend on what he said (or did not say) . . . and he has not alleged that he was placed in a higher level of security or faced any continuing restraints as a result of the . . . interrogation." *Id.* at 1225; *see also Georgison v. Donelli*, 588 F.3d 145, 157 (2d Cir. 2009) ("*Miranda* warnings were not required in this case where 'there were no restrictions on [defendant's] freedom over and above ordinary prison confinement[.]'").

Here, Defendant was in custody when he appeared before the grand jury as he was incarcerated at the time. However, his testimony before the grand jury was unrelated to the reasons for his incarceration and there was no indication that his testimony would

have any influence on the circumstances of his imprisonment. Thus, his incarceration alone did not necessitate *Miranda* warnings prior to his grand jury testimony where such warnings would not otherwise be required. *See United States v. Artis*, 2010 WL 3767723, at *5-6 (D. Vt. Sept. 16, 2010) (noting that defendant was incarcerated for an unrelated crime and that he was not threatened with any greater restrictions on his freedom or further punishment for failure to answer questions, the court concluded that his "status as an inmate therefore did not, alone, transform the . . . interview into custodial interrogation"); *United States v. Weekley*, 2000 WL 34031009, at *2-3 (N.D. Iowa Feb. 2, 2000) (denying defendant's motion to suppress statements that he made during a sentencing hearing when he was in custody on an unrelated matter).

Defendant was advised in plain and simple language of the nature of the grand jury's investigation and his rights with regard to it. He was advised that the Government was making no promises to or agreements with him in exchange for his testimony. He was advised that he was not required to answer a question if a truthful answer would incriminate him. He was also advised that his testimony was recorded and may be used against him in a subsequent criminal proceeding. He was advised that if he testified untruthfully, he could be prosecuted for perjury, making a false statement, and obstruction of justice. He was advised of his right to consult with an attorney outside of the grand jury room and told that if he could not afford an attorney the court could appoint one.

Although Defendant faults the Government's warnings as imperfectly tracking *Miranda*, there is no requirement that they do so and he fails to identify a single constitutional right that the Government neglected to mention in its warnings. Any alleged failure to notify Defendant that he may be a target of the investigation does not give rise to a constitutional violation. *See Washington*, 431 U.S. at 189 ("Because target witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination, potential-defendant warnings add nothing of value to the protection of Fifth Amendment rights."); *United States v. Valentine*, 820 F.2d 565, 572 (2d Cir. 1987) (affirming the district court's refusal to suppress statements "because

[defendant] had no constitutional right to receive a target warning, and was otherwise well advised of his constitutional and statutory rights") (internal citations omitted).

Finally, there is no evidence that Defendant's grand jury testimony was involuntary. "Since . . . a grand jury proceeding is not 'judicial,' [defendant's] confession cannot, under the due process clause, be used in a criminal proceeding against him unless it was voluntary." *United States v. St. Pierre*, 132 F.2d 837, 846 (2d Cir. 1942). "Appearing before a grand jury is not in itself an unduly coercive situation." *United States v. Cleary*, 265 F.2d 459, 462 (2d Cir. 1959). Defendant's testimony was relatively brief and there is no evidence that Defendant expressed an unwillingness to testify at any point and was thereafter, in any way, compelled to do so. There is also no evidence of government misconduct or overreaching. As the Second Circuit has noted, "[t]he important factor is the lack of even the slightest suggestion that government officials applied any pressure or engaged in any form of misconduct which contributed to his testifying." *Id.*; *see also United States v. Capaldo*, 402 F.2d 821, 824 (2d Cir. 1968) (finding grand jury testimony "completely voluntary" when defendant was told of the nature of the proceeding and warned of his rights, noting that "[a] properly called and fully warned witness cannot complain about a statement voluntarily given").

For the foregoing reasons, the court DENIES Defendant's motion to suppress his grand jury testimony on January 20, 2011.

### D. Whether Defendant Voluntarily Waived His *Miranda* Rights Prior to the October 10, 2011 Interview and Whether His Statements Were Voluntary.

The parties do not dispute that Defendant's statements on October 10, 2011 were the result of a custodial interrogation, entitling him to *Miranda* warnings. Moreover, the parties agree that Defendant was read his *Miranda* rights and signed the *Miranda* waiver forms prior to making any incriminating statements. Defendant contends, however, that he did not knowingly and voluntarily waive his rights because he lacked the mental capacity to understand or exercise them. He further argues that his statements were involuntary.

35

If *Miranda* warnings are required and given, a statement may be used against a defendant if he or she waived his or her rights "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. A waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran*, 475 U.S. at 421. "The government is required to prove waiver by a preponderance of the evidence[.]" *United States v. Male Juvenile*, 121 F.3d 34, 39 (2d Cir. 1997) (internal citation and quotation marks omitted); *see also Miranda*, 384 U.S. at 475 ("If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.").

The "inquiry into the knowing and voluntariness of a waiver is 'directed to a defendant's state of mind, which can be inferred from his actions and statements.'" *In re Terrorist Bombings*, 552 F.3d at 211 (quoting *United States v. Spencer*, 995 F.2d 10, 11 (2d Cir. 1993)). A knowing and intelligent waiver reflects "full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." *Moran*, 475 U.S. at 421. However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Colorado v. Spring*, 479 U.S. at 574. Accordingly, a law enforcement officer need not disclose the purpose of the interrogation to the Defendant or the potential charges under investigation. *See id*. at 577.

To determine the validity of a *Miranda* waiver, the court must consider the totality of circumstances, "including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374-75 (1979). This requires a fact-specific inquiry. *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

Defendant argues that his personal characteristics made him unable to knowingly and voluntarily waive his *Miranda* rights or voluntarily speak to the law enforcement officers. With respect to the validity of a *Miranda* waiver, "[a] fundamental concern is a mentally deficient accused's vulnerability to suggestion." *Henry v. Dees*, 658 F.2d 406, 409 (5th Cir. 1981). However, a defendant's mental disabilities may result in finding a

36

*Miranda* waiver involuntary only if he is "so incompetent that he was not aware 'both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Male Juvenile*, 121 F.3d at 40. In other words, "diminished mental capacity alone does not prevent a defendant from validly waiving his or her *Miranda* rights. Rather, that factor must be viewed alongside other factors, including evidence of the defendant's conduct during, and leading up to, the interrogation." *Garner*, 557 F.3d at 264-65 (internal citations omitted).[16]

Defendant has documented intellectual, mental, and emotional deficiencies which give rise to at least some concern regarding his ability to understand and waive his *Miranda* rights. However, the court has found Defendant competent to understand comparable plea, trial, and sentencing rights. Dr. Willmuth agreed that Defendant is competent to waive those rights in connection with a criminal proceeding provided certain trial accommodations are made. It is difficult to discern how a criminal defendant could be competent to participate in a Fed. R. Crim. P. 11 plea colloquy and a federal court sentencing, and yet be unable to understand his oft-repeated *Miranda* rights. Certainly Dr. Willmuth does not provide that explanation.

At the time of the October 10, 2011 interview, Defendant was an adult with considerable experience in the criminal justice system who could read, without apparent difficulty, the *Miranda* warnings provided to him. He had been arrested at least twice prior to the October 10, 2011 interview which took place immediately following his release from incarceration. Indeed, he questioned why federal agents had waited for his release to arrest him. He asked questions in an effort to determine the nature of the charges against him and what might happen next. He displayed no overt confusion or

---

[16] Courts have found defendants with significant mental deficiencies competent to validly waive *Miranda* rights. *See, e.g., Moore v. Dugger*, 856 F.2d 129, 132, 134 (11th Cir. 1988) (finding defendant with an IQ of sixty-two knowingly and voluntarily waived his *Miranda* rights); *Harris v. Riddle*, 551 F.2d 936, 938-39 (4th Cir. 1977) (concluding that defendant, who was seventeen with an IQ of sixty-seven, voluntarily waived his *Miranda* rights when expert testified that he understood the right to remain silent, but may not have understood all of the consequences of giving up the right).

hesitation and there is no evidence that he was terrified, intimidated, or in a state of extreme physical or emotional distress.

Prior to the October 10, 2011 interview, Defendant had been questioned on at least five occasions by law enforcement. He received *Miranda* warnings on at least three of these occasions and had signed five separate *Miranda* waivers. In the course of an October 15, 2010 interview, he advised law enforcement that they did not need to read him his rights because he already knew them. Defendant has also demonstrated an ability to invoke his right to counsel and his privilege against self-incrimination. *See* n.1 *supra.* These facts weigh in favor of finding valid a *Miranda* waiver on October 10, 2011. *See Smith v. Mullin*, 379 F.3d 919, 934 (10th Cir. 2004) (concluding that defendant, who had limited intellectual functioning, voluntarily waived his *Miranda* rights, explaining that "[s]ignificantly, [defendant] had prior experience with the criminal justice system [and previously] he retained counsel to defend him on an assault charge, eventually pled guilty, and served time in prison"); *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) (finding voluntary waiver of *Miranda* rights, the court noted that defendant had previous arrests where he had been given *Miranda* warnings).

The agents who conducted the October 10, 2011 interview were familiar to Defendant as both Agent Mostyn and Agent Campbell had questioned Defendant previously. They told him that he was under arrest and the nature of the potential charges against him. They also told him that he was being taken to an ATF office where he would be processed, that he would likely be incarcerated thereafter, and would be taken to court the following morning. Defendant appeared satisfied with these responses and indicated that it did not sound too bad.

In the course of the October 10, 2011 interview, Defendant freely asked questions of law enforcement regarding a variety of matters. He evidenced an understanding that he would need to waive his *Miranda* rights in order to speak to law enforcement and have some of his questions answered. When he signed waivers based upon this understanding, he told Agent Mostyn that he expected his questions to be answered. Defendant posed no questions regarding his *Miranda* rights or the waiver forms. On at least three separate

38

occasions during the October 10, 2011 interview, Defendant acknowledged his understanding of his *Miranda* rights, and on at least one occasion, he accurately paraphrased that he had the right to stop the interview at any time. *See Garner*, 557 F.3d at 262 (finding that defendant's "conduct during, and leading up to, the interrogation indicated that [defendant] understood and appreciated his *Miranda* rights before executing the waiver" despite the results of a Grisso test indicating that the defendant could not understand his rights).

The interview proceeded in a conversational manner. The agents offered to purchase Defendant food or a beverage and apparently purchased cigarettes for him. There is no evidence that the agents threatened Defendant, engaged in trickery or deceit, or displayed weapons or a show of force. These facts support both a valid waiver and the absence of law enforcement coercion.

The written waivers of Defendant's *Miranda* rights, alone, weigh heavily in favor of finding his waivers valid. *See Butler*, 441 U.S. at 373 ("An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."). They also weigh in favor of finding that his statements were voluntary. *See Dickerson v. United States*, 530 U.S. 428, 444 (2000) ("The requirement that *Miranda* warnings be given does not, of course dispense with the voluntariness inquiry. But as we said in *Berkemer v. McCarty*, 468 U.S. 420 (1984), '[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare.'") (citing *Berkemer*, 468 U.S. at 433, n.20). Indeed, Defendant makes no colorable argument of government misconduct or overreaching in connection with the October 10, 2011 interview. *See Connelly*, 479 U.S. at 170.

Examining the totality of the circumstances, the Government has shown, by a preponderance of the evidence, that Defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to the October 10, 2011 interview and that his statements

made during that interview were voluntary. The court thus DENIES Defendant's motion to suppress those statements.

## CONCLUSION

For the foregoing reasons, Defendant's Motion to Suppress (Doc. 28) is DENIED. SO ORDERED.

Dated at Rutland, in the District of Vermont, this _26_ th day of March, 2013.

Christina Reiss, Chief Judge
United States District Court